940 F.2d 495
 60 USLW 2110
 Maria Elena CAMPOS; Milton Cardenas Alvarado; Salomon
Ayala Lopez; Rene Blanco Lopez, Luis Alonzo Hernandez-Cruz,
Manuel de Jesus Jaime-Garcia, Jose Fredy Ramirez-Sanchez,
Mauricio Rosales-Hernandez, Justiniano Salcado-Machado,
Fredy Sandoval-Mazariegos, Maria Antonio Vasquez-Cortez,
Plaintiffs-Appellants,
v.
William F. NAIL, Jr.; Richard Thornburgh,*
Attorney General, Defendants-Appellees.
 No. 89-16597.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 13, 1990.
Decided July 30, 1991.
As Amended on Grant of Rehearing
in Part and Denial of Rehearing
in Part Nov. 5, 1991.
 
 Anne Pilsbury, Central American Legal Assistance, Brooklyn, N.Y., for plaintiffs-appellants.
 Stewart Deutsch, Office of Immigration Litigation, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before SNEED, SCHROEDER and CANBY, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Maria Elena Campos, on behalf of a class of Salvadoran and Guatemalan aliens,[1] sought injunctive and declaratory relief to redress an alleged unconstitutional practice engaged in by Immigration Judge William F. Nail, Jr., and not restrained by his superior, the Attorney General. Appellants' complaint alleges that Judge Nail engaged in a "pattern and practice" of denying all requests for change of venue made by asylum seekers from El Salvador and Guatemala. The district court found that Judge Nail did engage in an unconstitutional pattern or practice but dismissed the action for lack of subject matter jurisdiction. We reverse.
 
 
 2
 The sole issue before us is whether the district court has subject matter jurisdiction to hear this matter. We review questions of subject matter jurisdiction de novo. Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir.1989).
 
 FACTS
 
 3
 The appellants are Salvadoran and Guatemalan nationals who entered the United States along the Mexican border without inspection, hoping ultimately to obtain asylum. Upon being apprehended and subjected to deportation proceedings, they filed applications for asylum. Their cases were assigned to Judge Nail, an immigration judge in Phoenix, Arizona.[2]
 
 
 4
 Most of the appellant class, after their arrests, were detained at an immigration detention center in Florence, Arizona, until they could arrange to be released on bond. Many of those detained in Florence had been arrested in California; their cases, too, were assigned to Judge Nail.
 
 
 5
 The asylum applications filed by appellants were subjected to lengthy delays in processing. INS regulations require that an advisory opinion be sought from the Department of State, Bureau of Human Rights and Humanitarian Affairs, once an asylum application is submitted. 8 C.F.R. Sec. 208.10 (1984). Because of the large number of persons seeking asylum, particularly from El Salvador in the early 1980's, and for other reasons, there was a considerable delay in securing the State Department's reply.
 
 
 6
 Because of this delay in the asylum process, many Salvadorans and Guatemalans, including all the appellants, had been out on bond for many months by the time their cases were ready to be heard. During this time, many of the refugees had moved to other states, to be close to family or to obtain jobs. As a result, the appellants submitted requests to change venue.[3] The appellants were willing to admit alienage and lack of proper documentation in order to obtain a change of venue, thus relieving the INS of the burden of having to establish alienage through the testimony of distant arresting officers.
 
 
 7
 According to the allegations of the complaint, Judge Nail employed a blanket policy: unless the asylum seeker had established a residence in the United States before being arrested, Judge Nail would not grant a change of venue.[4] Because of this policy, all new asylum seekers arrested crossing the border were required to come to Phoenix for their final hearing no matter where they were living at the time of their hearing and no matter what the cost or inconvenience of the travel. Plaintiffs allege that Judge Nail's policy arbitrarily denied them fair hearings on their asylum claims.
 
 ANALYSIS
 
 8
 The district court held that 8 U.S.C. Sec. 1105a(a) deprived it of jurisdiction over this case. Section 1105a(a) vests exclusive jurisdiction in the court of appeals to review "all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under section 1252(b) [deportation hearings]." Reasoning from Public Utility Comm'n v. Bonneville Power Administration, 767 F.2d 622 (9th Cir.1985),[5] the district court concluded that any exercise of jurisdiction on its part would interfere with the statutory and exclusive jurisdiction of this court to review directly final orders of deportation.
 
 
 9
 After the district court entered its decision, however, this court decided Montes v. Thornburgh, 919 F.2d 531 (9th Cir.1990), which bears far more directly on this case than does Bonneville. In Montes, a group of asylum applicants challenged the practice of a particular immigration judge of requiring all asylum applicants to submit affidavits containing information not called for by INS regulations, and of "rejecting" applications that did not meet the judge's unspecified standard of sufficiency. The district court held that it had jurisdiction to entertain the action, and we affirmed. We held that section 1105a(a) and its grant of exclusive jurisdiction to the courts of appeal "does not apply to suits alleging a pattern and practice by immigration officials which violates the constitutional rights of a class of aliens." Id. at 535.
 
 
 10
 The government contends that the facts of Montes are easily distinguished from those in this case, and therefore Montes does not control.[6] We disagree. The principles articulated in Montes apply forcefully to the facts of the present case. Like the plaintiffs in Montes, the plaintiffs here do not seek the determination of the merits of any individual deportation order, but challenge a judge's blanket policy on constitutional grounds. Appellants allege that Judge Nail's policy applied to all Salvadoran and Guatemalan asylum seekers requesting change of venue, and that it constituted an established pattern or practice existing outside the context of any particular deportation hearing.[7] An integral part of plaintiffs' constitutional claim arises from the fact that the denials of change of venue were allegedly the result of a consistently-applied and rigid policy, and did not reflect consideration of individual cases. Such a claim is difficult, if not impossible, to present in an individual deportation proceeding[8] or in review of that proceeding before this court.[9] Moreover, even if an alien were able to prove an unconstitutional pattern or practice in his individual deportation appela, the only remedy available would be the reversal of that case, not an injunction. This would do little to alleviate the harm caused to a class of persons injured by the unconstitutional practice. It is only through an action in district court that the injured class members can obtain an injunction stopping the unconstitutional practice. See Haitian Refugee Center v. Smith, 676 F.2d 1023 (5th Cir.1982). We conclude, therefore, that Montes is fully applicable, and controls this case.
 
 
 11
 The principle established in Montes has since received powerful support from the Supreme Court, in McNary v. Haitian Refugee Center, --- U.S. ----, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). There a group of farmworkers challenged as unconstitutional a pattern or practice of the INS in dealing with legalization applications under the Immigration Reform and Control Act of 1986. That Act included a new section 210(e) of the Immigration Act, 8 U.S.C. Sec. 1160(e), which provided that a denial of adjustment of status (legalization) could be subjected to judicial review "only in the judicial review of an order of exclusion or deportation under section 1105a of this title." 8 U.S.C. Sec. 1160(e)(3)(A).
 
 
 12
 The Supreme Court held that section 210(e) did not prevent the district court from entertaining the "pattern or practice" case brought by the farmworkers. The provisions of section 210(e) clearly dealt only with single determinations on an administrative record. Such review proceedings could not properly deal with the kind of claim being asserted by the farmworkers:
 
 
 13
 [Section 1160(e)(3)(B) ] incorporates an assumption that the limited review provisions of Sec. 210(e) apply only to claims that have been subjected to administrative consideration and that have resulted in the creation of an adequate administrative record. However, the record created during the SAW administrative review process consists solely of a completed application form, a report of medical examination, any documents or affidavits that evidence an applicant's agricultural employment and residence, and notes, if any, from an LO interview--all relating to a single SAW applicant. Because the administrative appeals process does not address the kind of procedural and constitutional claims respondents bring in this action, limiting judicial review of these claims to the procedures set forth in Sec. 210(e) is not contemplated by the language of that provision.
 
 
 14
 Id. 111 S.Ct. at 896-97. The Court went on to note that "had Congress intended the limited review provisions of Sec. 210(e) of the INA to encompass challenges to INS procedures and practices, it could easily have used broader statutory language." Id. at 897.
 
 
 15
 Much the same can be said of the related statutory structure in the present case. It is true that Haitian Refugee Center dealt with a challenge to a pattern or practice of the INS, rather than that of a single immigration judge, but the difficulties of raising a "pattern or practice" claim in an individual proceeding are as great in the one situation as in the other. In any event, Montes did involve a challenge to the practices of a single judge, and it binds us.
 
 CONCLUSION
 
 16
 The judgment of the district court dismissing the action for lack of subject matter jurisdiction is
 
 
 17
 REVERSED.
 
 
 
 *
 Richard Thornburgh has been substituted for William French, Fed.R.App.P. 43(c)
 
 
 [1]
 The class consists of all Salvadorans and Guatemalans who entered this country between January 1, 1980, and October 1, 1985, who have sought political asylum in this country, and who have had motions for change of venue denied by Immigration Judge William F. Nail during that period
 
 
 [2]
 Judge Nail served as an immigration judge in Phoenix from September 1982 to September 1985. Until late 1983, he was the sole judge for this area. In 1983, he was joined by a second judge who shared the same caseload but whose policies are not at issue here. The authority of the judges is delegated from the Attorney General. 8 C.F.R. Sec. 3.10
 
 
 [3]
 Appellants made their requests because they lacked funds to travel to Phoenix, they had relatives who could testify in their cases in their home jurisdiction, or they had no attorney in Phoenix but had free Spanish-speaking counsel in the jurisdiction to which they wished venue changed
 
 
 [4]
 No other immigration judge had such a policy
 
 
 [5]
 In Bonneville we held that the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. Sec. 839, et seq. (1982), barred district court jurisdiction of a constitutional challenge to agency proceedings. We stated that "by assigning jurisdiction over constitutional challenges to the court of appeals, section 9(e)(5) preempts district court jurisdiction under the general federal question statute." Section 9(e)(5) provides that "[s]uits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter ... shall be filed in the United States court of appeals for the region."
 
 
 [6]
 The plaintiffs in Montes alleged that an immigration judge's requirement that asylum seekers submit documentation additional to that required by the regulations constituted an unconstitutional pattern and practice
 
 
 [7]
 We do not here determine whether Judge Nail's actions constitute an unconstitutional pattern or practice. Our determination is limited to the jurisdictional issue
 
 
 [8]
 There is no discovery in deportation proceedings and no opportunity to cross-examine the agency official. Gordon & Rosenfield, 1 A Immigration Law & Procedure, sec. 5.6. There is limited authority to allow the alien to request the judge to subpoena witnesses and documents and the judge can decline if the material does not seem strictly relevant. Matter of R, 5 I & N 612 (1954); Matter of C, 9 I & N 524 (1962); Matter of Joseph, 13 I & N 70 (1968)
 
 
 [9]
 Evidence of the impossibility of proving up a pattern and practice through case-by-case direct appeals is found in this court's own decisions. This Court twice reversed individual deportation orders entered by Judge Nail because of the failure to change venue or allow the alien time to get representation, but both times our decision focused on the issue of "abuse of discretion." See Baires v. INS, 856 F.2d 89 (9th Cir.1988) and Castro-O'Ryan v. INS, 847 F.2d 1307 (9th Cir.1987). In both cases, we commented unfavorably on what Judge Nail had done or said in denying a change of venue, but in neither decision did we address whether Judge Nail had a blanket policy against changing venue